IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs June 2, 2004

### BERNARD KEYS v. STATE OF TENNESSEE

**Direct Appeal from the Criminal Court for Shelby County**
**No. P-26734    Bernie Weinman, Judge**

_____

**No. W2003-01846-CCA-R3-PC  - Filed July 20, 2004**
_____

A Shelby County jury convicted the Petitioner, Bernard Keys, of aggravated burglary and evading arrest. The trial court sentenced the Petitioner to fifteen years in prison for the aggravated burglary conviction, and eleven months and twenty-nine days for the evading arrest conviction, and ordered that the sentences run consecutively. The Petitioner filed a petition for post-conviction relief, alleging that his attorney was ineffective for failing to investigate his case and prepare properly for trial. Following a hearing, the post-conviction court denied the petition. Finding no error, we affirm the post-conviction court's judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which DAVID H. WELLES and DAVID G. HAYES, JJ., joined.

John H. Parker, II, Memphis, Tennessee, for the appellant, Bernard Keys.

Paul G. Summers, Attorney General and Reporter; Jennifer L. Bledsoe, Assistant Attorney General; William L. Gibbons, District Attorney General; Emily Campbell, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**
**I. Facts**

This Court summarized the underlying facts of the Petitioner's case on direct appeal as follows:

> Ennis Brown, the victim, testified that he left his residence for work at approximately 6:00 a.m. on April 22, 1999, and saw the defendant on the street. The defendant, who wore a white Nike cap with a blue bill, whispered something to a companion

and looked toward Brown's house. The victim was concerned and returned to his home where he stayed approximately an hour before leaving again for work. When the victim returned to his residence at approximately 9:45 p.m., he noticed a light was burning in his bedroom, and a window was broken. The victim entered and found his home "ransacked" with numerous items missing, including a television, VCR, and checkbook. In his yard Brown found a white Nike cap with a blue bill, which he identified as belonging to the defendant. Brown previously had seen the defendant selling items on the street, including guns, televisions, and VCRs.

Juanita Duncan was Brown's neighbor and was deceased at the time of trial. The recording of her testimony at the preliminary hearing was admitted at trial under the former testimony exception to the hearsay rule. See Tenn. R. Evid. 804(b)(1). She testified at the preliminary hearing that she saw the defendant loading items, including a television, into three sacks while in the victim's yard on the day of the burglary.

Officer Clifton Dates testified he and his partner were on patrol on April 28, 1999. While driving in his cruiser, Officer Dates saw the defendant walking and recognized him from a departmental bulletin. When the defendant saw the officers, he walked quickly away. Officer Dates then turned the cruiser to follow the defendant, and the defendant removed his hat and a bag and ran. Officer Dates called for assistance, and approximately eight officers, a helicopter, and a canine unit assisted in the defendant's capture.

The defense presented no proof at trial.

Based upon this evidence, the defendant was convicted of aggravated burglary and evading arrest.

State v. Bernard Keys, No. W2000-03138-CCA-R3-CD, 2001 WL 1690201, at *1 (Tenn. Crim. App., at Jackson, Dec. 17, 2001), *perm. app. denied* (Tenn. May 20, 2002).

On August 23, 2002, the Petitioner filed a pro se petition for post-conviction relief, alleging that his trial counsel was ineffective for failing to investigate and prepare adequately for trial. The post-conviction court appointed an attorney to represent the Petitioner. An amended petition was subsequently filed.

At the post-conviction hearing, Mary McKinnley, the Petitioner's grandmother, testified that the Memphis Housing Authority worked on her house and removed an old commode and sink. She stated that the Petitioner wanted to take the items from her property and install them in his sister's house. McKinnley said that she gave the Petitioner permission to use the items. She stated that, although she could no longer remember the specific month, on the twenty-second day of the month that the robbery occurred, she returned home to find the commode and sink gone. She explained that

-2-

she remembered the day because she had won money after going to the casino. On cross examination, McKinnley said that she loved the Petitioner and did not want him to go to jail. She said that she does not know what the Petitioner was doing during the morning when she was at the casino.

Trina Keys, the Petitioner's cousin, testified that she was with the Petitioner at times in April 1999, including when he retrieved the toilet and sink from Mary McKinnley's house around 8:30 a.m. She stated that he removed the items between April 21 and April 23, 1999. She said that she was living with Mary McKinnley at the time. Trina Keys testified that, after the Petitioner removed the items, they arrived at the house of his sister, Beverly Keys Mitchell, between 8:45 and 9:00 a.m. She stated that she was with the Petitioner at Mitchell's house until between 7:00 and 9:00 p.m. She said that they were babysitting. Trina Keys noted that she remembered the general date because it was "a day or two" after her birthday.

The Petitioner testified that his trial attorney, Greg Carman ("Counsel"), did not investigate his case and secure witnesses for his defense. He stated that he wanted Counsel to question Mary McKinnley, Beverly Keys Mitchell, Trina Keys, and Gloria Jackson. The Petitioner stated that the witnesses would have provided an alibi for him at the time of the robbery. He said that he understood that Counsel was not an investigator. He stated that he informed Counsel of these witnesses approximately six months before the trial date. The Petitioner said that he provided Counsel with addresses and phone numbers for Mary McKinnley and Beverly Keys. He stated that Gloria Jackson, whose Nissan truck he borrowed to move the sink and toilet, would be harder to contact because she recently moved. The Petitioner said that he requested that Counsel see him in jail, but Counsel never visited him. He said that Counsel failed to investigate for other possible wearers of the white Nike hat found near the crime scene and did not submit the hat for DNA[1] testing. The Petitioner said that "[e]verbody in the neighborhood had one." He testified that Counsel should have obtained fingerprint testing on a crowbar that was allegedly used in the crime.

The Petitioner stated that he had a conversation with the victim, wherein the victim asked to be contacted if any of his stolen property surfaced. The Petitioner explained that, when the police found him, he was involved in a marijuana sale, and this transaction prompted him to evade police. The Petitioner said that he informed Counsel of this transaction. The Petitioner testified that the place where the deceased eyewitness saw him is a "common alley that people go through every day" as a shortcut.

The State called Counsel, who testified that he has been with the Shelby County Public Defender's Office as an attorney since 1996.[2] Counsel said that he represented the Petitioner in his trial. Counsel stated that the Petitioner never mentioned the specific alibi witnesses whom he wished to call until the jury had been sworn. He said that he told co-counsel Josh Spickler to note in their

---

[1]Deoxyribonucleic acid.

[2]Counsel testified that he served as an intern in the office for three years prior to becoming an attorney.

records the date and time that the Petitioner mentioned his sister as a potential alibi witness. Counsel testified that, in a prior interview, he had questioned the Petitioner about potential alibi witnesses, and the Petitioner did not indicate any. He stated that he noted this information in his internal records. Counsel said that, during one visit, the Petitioner provided two witnesses who would testify that the Petitioner and victim had a confrontation earlier in the year. Counsel stated that the Petitioner viewed these witnesses as showing motivation for the victim to fabricate the story. Counsel said that, during a subsequent visit, the Petitioner identified Richard Keys and Tracy Keys, who might also have been known as Richard Wallace and Tracy Wallace. Counsel stated that investigators were unable to contact these individuals. He explained that, according to police officers, fingerprint testing was not possible. Counsel said:

> I met with [the Petitioner] on every court date in Division 5. Our judge at that time allowed us to have lengthy discussions with our clients in the back because he knew it was difficult to get them up from jail. In addition to that, I did visit him in jail before [the] trial date with attorney Josh Spickler. And that specific date was 9/25 of 2000. We spent approximately two hours in the jail[] holding tanks, with [the Petitioner] discussing his trial and the potential outcome and the potential possibilities of what may . . . arise at trial.

Counsel denied the Petitioner's assertion that Counsel had not met with the Petitioner. Counsel stated that, to his recollection, DNA testing and fingerprinting tests would not have been possible. He testified that he used in-house investigators with the Public Defender's Office to interview potential State and defense witnesses. Counsel stated:

> [E]ven though these were family members of [the Petitioner] and even though [the in-house investigators] left cards and made numerous home attempts and phone calls, we got no response from any family members. As a matter of fact, until this day in court, that was the first time I've seen any family members of [the Petitioner]. I've never had any contact with them via phone, letter, or otherwise. And I wouldn't even have recognized them until they took the stand and stated their names.

Counsel said that he took detailed notes of his interactions with the Petitioner because he had been through "a number of post convictions before," and various issues may arise afterward if a defendant receives a substantial sentence.

On cross-examination, Counsel said that he had tried approximately ten to twelve cases in Division 5. He testified that, at the time of the Petitioner's case, he had "potentially hundreds" of other cases set for trial and that such workloads were typical. Counsel stated that, on days when he interviewed clients, he met on average with two to four clients in a day. He said that he was able to meet for extensive periods with clients if necessary. He stated that asking the Petitioner in the initial interview if he had an alibi is part of standard departmental practice. Counsel said that the Petitioner did not provide any information as to the location of his alibi witnesses. Counsel testified regarding the at-trial notification of alibi witnesses:

No, I did not [try and locate the suggested witnesses for trial]. [I] [d]id not have an opportunity. We were in trial. We had already entered a not guilty plea. The jury had been sworn. We were preparing opening statements within five minutes of that information that I received from [the Petitioner]. . . .

[Co-counsel Spickler] could have gone out and filled out a subpoena, but then we couldn't have gotten it served time in time absent him being able to go out and locate those witnesses. And at the time, what I was more interested in . . . having him be prepared for this trial since we were going forward then. Whether we could find witnesses would be an issue down the road, but considering the fact that [the Petitioner] had never even mentioned this alibi until the day of trial some approximately 10 months after I had been representing him, [I] didn't feel there was an adequate basis to try to go locate these witnesses, not knowing what they would potentially say. And also considering the fact that every time we had made any attempts to contact any family members with our investigators, we had absolutely no response.

Counsel testified that no one from his office spoke with the investigating police officers because the officers have no obligation to respond and, therefore, ordinarily refuse. He said that he was aware that the officers might testify that the Petitioner had left items at the crime scene.

The Petitioner called Beverly Keys Mitchell, the Petitioner's sister. She testified that she asked the Petitioner to retrieve a toilet and sink from their grandmother's residence. She stated that, although she could not remember the exact date, she recalled that Gloria Jackson and Katrina Dickens[3] arrived with the Petitioner at her house with the items between 8:30 and 9:00 a.m. Mitchell said that the three left between 10:00 and 11:00 p.m. She testified that the Petitioner did not leave the house for an extended period of time that day and that Gloria Jackson left to purchase beer from the store for the three.

The post-conviction court found that "the advice given and the services rendered were within the range of competency demanded by an attorney in a criminal case and that [Counsel's] representation of the defendant in his trial complied with the requirements set out by the Supreme Court of Tennessee in the case of Baxter v. Rose, 523 S.W.2d 930." Accordingly, the post-conviction court denied the Petitioner's petition for post-conviction relief.

## II. Analysis

On appeal, the Petitioner contends that Counsel was ineffective for: (1) not attempting to interview potential alibi witnesses; and (2) only meeting with the Defendant on his court dates and for two hours at the jail. In order to obtain post-conviction relief, a petitioner must show that his or her conviction or sentence is void or voidable because of the abridgment of a constitutional right.

---

[3]Mitchell identified "Katrina Dickens" as her cousin and indicated that she also went by "Trina Keys."

Tenn. Code Ann. § 40-30-203 (1997). The petitioner bears the burden of proving factual allegations in the petition for post-conviction relief by clear and convincing evidence. Tenn. Code Ann. § 40-30-210(f). A post-conviction court's factual findings are subject to a de novo review by this Court; however, we must accord these factual findings a presumption of correctness, which is overcome only when a preponderance of the evidence is contrary to the post-conviction court's factual findings. Fields v. State, 40 S .W.3d 450, 456 (Tenn. 2001). A post-conviction court's conclusions of law are subject to a purely de novo review by this Court, with no presumption of correctness. Id. at 457.

The right of a criminally accused to representation is guaranteed by both the Sixth Amendment to the United States Constitution and Article I, section 9, of the Tennessee Constitution. State v. White, 114 S.W.3d 469, 475 (Tenn. 2003); State v. Burns, 6 S.W.3d 453, 461 (Tenn. 1999); Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975). This right to representation includes the right to "reasonably effective" assistance. Burns, 6 S.W.3d at 461. The Tennessee Supreme Court has held that the issue of ineffective assistance of counsel is a mixed question of law and fact and, as such, is subject to a de novo review. Id.

In reviewing a claim of ineffective assistance of counsel, this Court must determine whether the advice given or services rendered by the attorney are within the range of competence demanded of attorneys in criminal cases. Baxter, 523 S.W.2d at 936. To prevail on a claim of ineffective assistance of counsel, a petitioner must show that "counsel's representation fell below an objective standard of reasonableness," Strickland v. Washington, 466 U.S. 668, 688 (1984), and that this performance prejudiced the defense, resulting in a failure to produce a reliable result. Id. at 687; Cooper v. State, 849 S.W.2d 744, 747 (Tenn. 1993). To satisfy the requirement of prejudice, a petitioner must show a reasonable probability that, but for counsel's unreasonable error, the fact finder would have had reasonable doubt regarding the petitioner's guilt. Strickland, 466 U.S. at 695. This reasonable probability must be "sufficient to undermine confidence in the outcome." Id. at 694; see also Harris v. State, 875 S.W.2d 662, 665 (Tenn. 1994).

When evaluating an ineffective assistance of counsel claim, the reviewing court should judge the attorney's performance within the context of the case as a whole, taking into account all relevant circumstances. Strickland, 466 U.S. at 690; State v. Mitchell, 753 S.W.2d 148, 149 (Tenn. Crim. App.1988). The reviewing court must evaluate the questionable conduct from the attorney's perspective at the time. Strickland, 466 U.S. at 690; Cooper, 849 S.W.2d at 746; Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982). In doing so, the reviewing court must be highly deferential and "should indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Burns, 6 S.W.3d at 462. Counsel should not be deemed to have been ineffective merely because a different procedure or strategy might have produced a different result. Williams v. State, 599 S.W.2d 276, 279-80 (Tenn. Crim. App. 1980). The fact that a particular strategy or tactic failed or hurt the defense does not, standing alone, establish unreasonable representation. House v. State, 44 S.W.3d 508, 515 (Tenn. 2001) (citation omitted); Thomas Brandon Booker v. State, No. W2003-00961-CCA-R3-PC, 2004 WL 587644, at *4 (Tenn. Crim. App., at Jackson, Mar. 24, 2004), *no perm. app. filed*. However, deference to matters of strategy and

tactical choices applies only if the choices are informed ones based upon adequate preparation. House, 44 S.W.3d at 515.

Counsel testified that he met with the Petitioner multiple times prior to the trial, and the Petitioner never indicated that he had any alibi witnesses. Counsel said that, from their preliminary interview, he noted in his internal records the lack of an alibi. Counsel stated that the Petitioner revealed the potential alibi witnesses after the jury had been sworn. Counsel said that he did not pursue the alibi witnesses because past efforts to contact family members had been unsuccessful, and he did not feel that he had a basis to issue subpoenas. Nonetheless, Counsel testified that he used in-house investigators in this case to question potential witnesses when he had sufficient notice. Furthermore, Counsel said that he was within five minutes of preparing opening statements when he learned of the existence of the potential alibi witnesses. Moreover, Counsel testified that he met with the Petitioner on every court date because the trial judge allowed public defenders to have lengthy discussions with clients.

In determining that Counsel effectively represented the Petitioner at trial, it is apparent to this Court that the post-conviction court accredited the testimony of Counsel rather than the testimony of the Petitioner. The Petitioner has not shown that the services rendered by Counsel fell below the range of competence demanded of attorneys in criminal cases. See Baxter, 523 S.W.2d at 936. Therefore, we conclude, as did the post-conviction court, that the Petitioner has not proven by clear and convincing evidence that he received ineffective assistance of counsel.

### III. Conclusion

In accordance with the foregoing authorities and reasoning, we AFFIRM the post-conviction court's judgment denying post-conviction relief.

_____
ROBERT W. WEDEMEYER, JUDGE